IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                 No. CR 05-1484 MCA

JASON ALONZO CARRELL,

       Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S FIRST MOTION TO SUPPRESS

**THIS MATTER** comes before the Court on Defendant Jason Alonzo Carrell's first *Motion to Suppress Evidence* [Doc. 21] filed on September 10, 2005. Following several requests from the parties to extend the time for completion of briefing [Doc. 12, 14, 16, 19, 26, 31, 34, 35, 36, 37, 41, 44, 46, 49, 50, 52, 55, 56, 57, 58, 59, 66], the Court held hearings on Defendant's pending motions in Albuquerque, New Mexico, on the following dates: May 24, 2006; June 2, 2006; June 6, 2006; and June 9, 2006. [Doc. 81, 85, 93, 95.] Having considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearings, and being fully advised in the premises, the Court denies Defendant's motion based upon the findings of fact and conclusions of law set forth below.

Defendant is charged in a *Superseding Indictment* [Doc. 22] with one count of being a felon in possession of a firearm on or about January 6, 2005, and three other counts

alleging various drug and firearms charges arising from an incident that occurred on or about July 13, 2005.  Defendant has filed two motions to suppress evidence relating to the above charges.  This *Memorandum Opinion and Order* addresses Plaintiff's first *Motion to Suppress Evidence*, which only pertains to the incident of January 6, 2005.

## I.    **FINDINGS OF FACT**

1.    On the evening of January 6, 2005, Officers McCormick and Nez of United States Customs and Border Protection, along with Detective Mayhew of the Albuquerque Police Department, were patrolling a section of southeast Albuquerque, New Mexico, known as the "Kirtland Addition" or the "Kirt."

2.    Within its Southeast Area Command, the Albuquerque Police Department regards the Kirtland Addition as one of two major "trouble spots" or high-crime areas that present an especially high risk of danger to its officers.

3.    There are only two paved streets leading in and out of the Kirtland Addition: Mulberry Street on the west end of the neighborhood, and University Boulevard on the east end.

4.    University Boulevard between Gerald and Spence is a public street that lies within the Kirtland Addition.

5.    Based on Officer McCormick's personal experience during the time leading up to January 6, 2005, there was evidence of a high frequency of street-level narcotics trafficking involving hand-to-hand transactions between pedestrians and vehicle occupants

on University between Gerald and Spence; the officer had been to that location on prior occasions to investigate such activities.

6.      Based on Detective Mayhew's personal experience, it was common for narcotics traffickers in the Kirtland Addition to post lookouts on street corners in this portion of the Kirtland Addition in order to detect and warn others of any approaching police officers.

7.      Prior to January 2005, Detective Mayhew was personally involved in a number of arrests and investigations in the Kirtland Addition involving narcotics trafficking, shootings, fights, and burglaries.

8.      On one occasion a few weeks before January 6, 2005, Detective Mayhew and Officer McCormick attempted to stop a white Cadillac driving recklessly through the Kirtland Addition in the vicinity of University and Spence.

9.      The white Cadillac drove away from the officers' pursuit at a high rate of speed and was later found a few blocks away with its engine running and with a 40 caliber Glock magazine left on the front seat loaded to capacity with hollow-point bullets.

10.     Based on Detective Mayhew's experience, it is common for narcotics traffickers to carry firearms or other weapons in order to protect their cache of drugs and their sales territory.

11.     The officers' testimony regarding their recent, personal experiences patrolling the Kirtland Addition in the vicinity of University between Gerald and Spence provided the best evidence of whether this area is justifiably called a high-crime area; the statistics of

reported crimes and other evidence presented by Defendant regarding the safety of this area in relation to other areas of the city is not persuasive.

12.     In light of the concerns noted above, Detective Mayhew and Officers McCormick and Nez chose to patrol the Kirtland Addition while traveling together as a group in plainclothes and in an unmarked government vehicle equipped with police emergency lights mounted in the same location as the vehicle's headlights instead of on the vehicle's roof.

13.     On the evening of January 6, 2005, Officer McCormick was driving the unmarked vehicle, with Detective Mayhew in the front passenger seat and Officer Nez in the rear passenger seat.

14.     As the officers turned onto University and drove north toward the block between Gerald and Spence at about 8:20 p.m. on that date, Officer McCormick and Detective Mayhew saw a white Chevrolet Caprice parked diagonally facing southbound in the roadway in front of them with its lights on.

15.     There were also at least three other vehicles in the vicinity of the white Caprice at the time:  one parked in the driveway of a residence near the corner of University and Gerald, and two other vehicles with dark tinted windows parked by the sidewalk on University in front of or near that residence.

16.     The officers did not attach significance to these other vehicles at the time because they did not appear to be occupied and they were not blocking traffic.

-4-

17.     The white Caprice, however, unavoidably drew the officers' attention because it was blocking the path of their vehicle in the northbound traffic lane of University between Gerald and Spence.

18.     Officer McCormick stopped his vehicle about fifteen feet in front of the white Caprice because it was blocking his path.

19.     Officer McCormick then turned on his emergency lights in an effort to signal to the driver of the white Caprice that he should get his vehicle out of the officers' way.

20.     Aided by a streetlight at the corner of University and Gerald, Officer McCormick and Detective Mayhew observed that there were two occupants in the front seat of the white Caprice, as well as another individual (later identified as Defendant) standing outside the vehicle on the passenger side and leaning into the open passenger window in a manner consistent with the hand-to-hand transactions that often occur in street-level narcotics trafficking.

21.     When none of these individuals moved out of the way in response to the flashing lights on the officers' vehicle, the officers decided to exit their vehicle and approach the white Caprice on foot.

22.     When they stepped out of their vehicle and began to approach the white Caprice on foot, the officers verbally identified themselves as police and displayed their gold-colored police badges, which were fastened to chains around their necks.

23.     Officer McCormick and Detective Mayhew observed that, in response to these actions, Defendant stood up from beside the white Caprice, briefly looked at the officers,

moved his hands to the front waistband area of his pants, then turned away from the officers and began to walk away from them at a quick pace while leaning forward at an angle and turning his head back to look at the officers.

24.     In his past experience as a police officer, Detective Mayhew had seen suspects reach toward their waistband in a similar manner in order to conceal or gain access to a firearm.

25.     As Defendant continued walking away from the officers in this manner, Detective Mayhew drew his firearm, and both he and Officer Nez focused their attention on securing the occupants of the white Caprice.

26.     As Detective Mayhew walked closer to the white Caprice, he recognized the driver of that vehicle as Jabar Lewis, an individual whom Detective Mayhew had previously encountered during narcotics trafficking investigations.

27.     Mr. Lewis initially hesitated in response to Detective Mayhew's commands but was soon taken out of the vehicle, placed on the ground, and handcuffed.

28.     As Detective Mayhew and Officer Nez secured the occupants of the white Caprice, Officer McCormick focused his attention on Defendant as Defendant continued walking away from the officers and toward the driveway in front of the residence near the corner of University and Gerald.

29.     In response to these actions by Defendant, Officer McCormick drew his firearm and repeatedly stated "Police!  Show me your hands!" or words to that effect.

30.     Defendant did not comply with these commands and continued walking at a fast pace up the driveway in front of the residence near the corner of University and Gerald.

31.     As noted above, there was a dark-colored Acura vehicle parked in the driveway in front of this residence.

32.     The driveway where the Acura was parked and the adjacent front-yard area were not enclosed by fencing or other obstructions, shielded from public view, or associated with any intimate activities of the adjacent residence; rather, these areas were within the space exposed to the public where one would normally expect a visitor to approach the front door of the residence from the street when traveling on foot or by vehicle.

33.     As Officer McCormick followed Defendant and observed him from the bottom of the driveway near the street, Defendant walked up the driveway to the front of the Acura, then quickly spun around, crouched down, and put his hands underneath the vehicle.

34.     These actions led Officer McCormick to believe that Defendant could be taking cover in order to draw a weapon and fire at him.

35.     After Defendant put his hands underneath the Acura, Officer McCormick saw him place something there, and then Defendant stood up in front of the vehicle and began walking south from the driveway to the adjacent yard area in front of the residence.

36.     As he stood up and began walking from the driveway to the adjacent front-yard area, Defendant for the first time complied with Officer McCormick's command to raise and show his hands.

37.     Officer McCormick then ordered Defendant to go to a prone position face down on the ground, and Defendant complied with this command.

38.     By that time, Detective Mayhew had finished securing the occupants of the white Caprice and approached Officer McCormick's position to assist in detaining Defendant.

39.     While in the front-yard area immediately adjacent to the public sidewalk and exposed to the street, Detective Mayhew handcuffed Defendant and conducted a pat-down search of his person for weapons.

40.     Detective Mayhew's pat-down search revealed that Defendant was carrying $760 in cash in a manner that, based on Detective Mayhew's experience, was consistent with narcotics trafficking.

41.     As Detective Mayhew took over the task of securing Defendant, Officer McCormick went toward the area beside the dark-colored Acura where Defendant previously placed his hands when crouching in front of the vehicle.

42.     As he approached this location, Officer McCormick could see an object in plain view beneath the front of the vehicle; he walked closer, reached under the vehicle, and retrieved the object.

43.     Upon retrieving the object from beneath the Acura, Officer McCormick recognized that it was a loaded Glock handgun.

44.     Officer McCormick proceeded to make the gun safe so that it could not be fired.

45.     As Detective Mayhew handcuffed Defendant and Officer McCormick went to retrieve the Glock handgun, one of the two other vehicles parked on the street beside the residence started its engine, and the officers realized for the first time that the vehicle was occupied.

46.     In order to determine whether the vehicle that had just started its engine had any relationship to Defendant or the white Caprice, Detective Mayhew approached it and spoke with the driver, Wendolyn Hill.

47.     Mr. Hill was subsequently arrested for outstanding warrants, and a plastic bag containing what appeared to be marijuana was found on the driver's-side door of his vehicle.

48.     Several minutes later, the doors on the vehicle parked on the street behind Mr. Hill's vehicle opened, revealing a cloud of smoke and approximately five to seven occupants whom the officers had not seen previously due to the vehicle's darkly tinted windows.

49.     Officer McCormick smelled a strong odor of marijuana smoke emanate from the doors of the vehicle when they were opened, but none of the occupants of that vehicle were placed under arrest.

50.     The officers had requested backup, and within ten to fifteen minutes after the officers initially exited their vehicle in front of the white Caprice, other officers arrived on the scene and identified Defendant as a convicted felon who could not lawfully possess a firearm.

51.     In the presence of Detective Mayhew and Officer McCormick, another officer questioned Wanda Sharts, who along with her mother occupied the residence near the corner of University and Gerald that Defendant had approached before the officers detained him.

52.     Ms. Sharts identified herself as the owner of the Acura parked in the driveway where Officer McCormick saw Defendant place the Glock handgun.

53.     Ms. Sharts stated to the officers that she had parked the Acura in the driveway about 20 minutes to an hour before the incident, and she did not see a gun in the driveway at that time.

54.     Ms. Sharts further stated to the officers that the gun found by Officer McCormick was not hers and that neither she nor her mother owned or possessed any guns.

55.     At the suppression hearing on May 24, 2006, Ms. Sharts testified that she regards Defendant as a member of her extended family because her sister married Defendant's father's brother.

56.     According to Ms. Sharts, Defendant has an open invitation to visit her residence at any time, but he does not live there, stay overnight there, or keep his belongings there.

57.     There is no evidence that Defendant had permission to use Ms. Sharts' Acura or to store any of his belongings in or under that vehicle.

58.     At the suppression hearing on June 2, 2006, Defendant testified that he used to visit Ms. Sharts' residence at least five or six times per month, but he did not testify that

he lives there or had permission to use Ms. Sharts' Acura that was parked in front of the residence on January 6, 2005.

59.     Based on the totality of the circumstances, Defendant was not seized or detained within the meaning of the Fourth Amendment until after he walked away from the Acura and raised his hands in response to the officer's commands.

60.     Based on the totality of the circumstances known to the officers at the time Defendant walked away from the Acura and raised his hands, Defendant's initial seizure and detention was supported by a reasonable suspicion that criminal activity was afoot and that Defendant presented a threat to officer safety.

61.     Based on the totality of the circumstances, the security measures employed by the officers did not exceed the permissible scope of an investigative detention before they had probable cause for a full custodial arrest.

62.     Based on the totality of the circumstances, the officer's reasonable suspicion quickly ripened into probable cause justifying a full custodial arrest of Defendant when the officers recovered the loaded firearm from beneath the Acura and became aware of Defendant's prior felony conviction.

63.     The search of the area beneath the Acura where Officer McCormick found the loaded firearm was not tainted by any illegality in the seizure of Defendant's person because the officer already observed Defendant place an object in that location before he was seized within the meaning of the Fourth Amendment, and thus the officer's decision to look beneath

the Acura was based on information he independently obtained prior to the seizure of Defendant's person.

64.     At the time of the search and seizure on January 6, 2005, Defendant did not have a reasonable expectation of privacy in the Acura, the driveway where it was parked, or the adjacent front-yard area where he was arrested; therefore, he lacks standing to challenge searches or seizures of property occurring on these locations.

65.     Defendant also lacks standing to challenge the search or seizure of any of the other persons or vehicles in the vicinity of his arrest.

66.     Neither the driveway area where Officer McCormick saw Defendant place the loaded firearm nor the front-yard area where he was subsequently arrested fall within the curtilage of the adjacent residence; rather, these areas are open and accessible to the public from the street in front of the residence.

## II.     **LEGAL ANALYSIS AND CONCLUSIONS OF LAW**

### A.     **Fourth Amendment Claims**

Based on allegations that the officers violated his Fourth Amendment rights, Defendant moves to suppress all evidence seized by the officers during or as a result of the January 6, 2005, incident described in the above findings.  Defendant's motion requires the Court to determine (1) when the officer's pursuit of Defendant became a seizure of his person within the meaning of the Fourth Amendment, (2) whether the officers were justified in seizing and detaining him at that point based on officer-safety concerns and their suspicions that criminal activity was afoot, (3) whether the security measures that the officers

-12-

employed during the period of the initial seizure fell within the permissible scope of an investigative detention; (4) whether the officers' suspicions ripened into probable cause supporting a full custodial arrest after they had the chance to identify Defendant and find the firearm, and (5) whether Defendant had a reasonable expectation of privacy in the Acura, other vehicles or persons in the vicinity, the front-yard area beside the residence, or the driveway area where Officer McCormick found the loaded firearm.

With respect to Defendant's Fourth Amendment theories, I conclude that (1) Defendant was not seized until he emerged from beside the Acura and raised his hands in view of Officer McCormick, (2) the officers' decision to seize and detain Defendant at that point was supported by a reasonable suspicion that he was engaged in criminal activity and presented a threat to the officers' safety, (3) the security measures employed by the officers during the period of the initial seizure did not exceed the permissible scope of an investigative detention, (4) the officers' suspicions ripened into probable cause supporting a full custodial arrest as soon as they had the chance to identify Defendant and locate the firearm, and (5) Defendant did not have a reasonable expectation of privacy in the Acura, other vehicles or persons in the vicinity, the front-yard area, or the driveway area where the officer found the loaded firearm.

I first address the seizure and detention of Defendant's person, because Defendant has standing to challenge the warrantless seizure of his person regardless of his possessory interest or property interest in the adjacent vehicles or curtilage of the residence. See United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996). It is the Government's burden to

-13-

show that this warrantless seizure is reasonable. See United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993). If the Government cannot meet this burden, then the evidence obtained as a result of the seizure of Defendant's person must be suppressed unless it was obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawful seizure. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); see United States v. Erwin, 875 F.2d 268, 269 n.2 (10th Cir. 1989).

The Supreme Court has defined a Fourth Amendment "seizure" as "an intentional acquisition of physical control." Brower v. County of Inyo, 489 U.S. 593, 596 (1989). Under this definition, a seizure can occur in either of two ways. First, a seizure of a person may occur if there is a show of authority (such as verbal commands or the flashing lights of a police car) followed by the person's submission to that authority. See California v. Hodari D., 499 U.S. 621, 626-27 (1991). Second, an intentional "application of physical force to restrain movement" of a person's body may constitute at least a momentary seizure of that person, even if he or she later escapes. Id. at 626.

It does not follow, however, that a seizure within the meaning of the Fourth Amendment has occurred whenever there is a show of authority or an application of physical force by a law enforcement officer. If a show of authority does not cause the person at whom it is directed to stop and submit to that authority, then no seizure has occurred. See id. at 628-29. Further, an application of physical force to restrain a person's movement must be "willful" and "intentionally applied" in order to constitute a seizure, Brower, 489 U.S. at 596-97, and a subsequent escape terminates such a seizure, see Hodari D., 499 U.S. at 625.

In this case, the officers made a show of authority when they engaged the emergency lights on their vehicle and then issued verbal commands as they initially walked toward Defendant. But Defendant did not submit to the officer's show of authority until after he was observed placing an object underneath the Acura and emerging from the driveway into the front-yard area. Thus, I conclude that Defendant was not "seized" within the meaning of the Fourth Amendment until he emerged from beside the Acura and raised his hands in accordance with Officer McCormick's commands.

The next question is whether the officers' seizure of Defendant as he emerged from beside the Acura can be justified as an investigative detention under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny. Such an investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Adams v. Williams, 407 U.S. 143, 146 (1972).

Investigative detentions must meet two distinct requirements in order to be considered "reasonable" under the Fourth Amendment. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out" in this context, United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc).

-15-

The subjective intentions or state of mind of the Defendant are not relevant to determining whether the requirements of an investigative detention are satisfied in this context, because the objective reasonableness of the officers' actions is not determined on the basis of the way the scene appeared to Defendant or what he was actually thinking at the time.  See United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).  Rather, reasonable suspicion must be "based upon the information the officers had when the conduct occurred," Saucier v. Katz, 533 U.S. 194, 207 (2001), which does not include the testimony disclosed by Defendant and his family for the first time in subsequent interviews or at the suppression hearing.  At the time of the seizure of Defendant's person and the firearm, the officers did not know of Defendant's  testimony about his medical conditions (such as not being able to hear out of his left ear), nor did the officers know of Defendant's or Ms. Sharts' testimony about his status as a visitor at Ms. Sharts' residence.

In addition, the factual information available to the officers must be assessed from an objective standpoint, without regard to what subjective motivations or legal conclusions the officers themselves drew from that information.   "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'"  See Brigham City v. Stuart, 126 S. Ct. 1943, 1948 (2006) (quoting Scott v. United States, 436 U.S. 128, 138 (1978) (emphasis added)).

Because Defendant was not seized within the meaning of the Fourth Amendment until he emerged from beside the Acura and raised his hands, "the officers can consider everything

that happened up to that point to establish reasonable suspicion." United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003); accord United States v. Jensen, 41 Fed. Appx. 346, 350 (10th Cir. 2002) (unpublished order and judgment). The reasonableness of the officer's conduct must be assessed "from the perspective of a reasonable officer on the scene" at that point in time, recognizing the fact that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions. Graham v. Connor, 490 U.S. 386, 396-97 (1989).

The Court must consider the totality of the circumstances known to the officers at the time of the seizure, allowing them "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273-74 (2002) (quoting Cortez, 449 U.S. at 418). Under this approach, a reasonable suspicion may be based on "'a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.'" United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994) (quoting Terry, 392 U.S. at 22). Thus, the Court may not dismiss an officers suspicions based on a "divide and conquer" analysis that evaluates and rejects each of a series of factors in isolation from one another, without giving any deference to an officer's ability to distinguish between innocent and suspicious actions based on a cumulative assessment of those factors. See United States v. Johnson, 364 F.3d 1185, 1189-90 (10th Cir. 2004); United States v. Gandara-Salinas, 327 F.3d 1127, 1130 (10th Cir.2003).

-17-

Here the Government presented evidence concerning a number of specific factors which may be readily susceptible to an innocent explanation if considered alone, but which nevertheless combine to form a reasonable basis for the officers' suspicion that criminal activity was afoot and posed a threat to officer safety.  See Arvizu, 534 U.S. at 277-78.  The first factor is that the events in question occurred in a high-crime area known to the officers for its history of drug trafficking and violence based on their recent personal experience patrolling that area.   While an individual's presence in a high-crime area, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime, see Brown v. Texas, 443 U.S. 47, 52 (1979), "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Illinois v. Wardlow, 528 U.S. 119, 123 (2000).  Thus, the fact that the events leading up to a seizure occurred in a high-crime area can be "among the relevant contextual considerations" in the Court's analysis of the totality of the circumstances.   Id.; accord United States v. Dennison, 410 F.3d 1203, 1208 (10th Cir. 2005).

In addition to the fact that the events in question occurred in an area known to the officers as a high-crime area, the officers noted that the configuration in which they initially observed Defendant standing beside the white Caprice parked in the middle of the roadway and leaning into the passenger-side window was consistent with street-level drug trafficking. Such behavior also may constitute a traffic violation in and of itself, because New Mexico's Traffic Code generally prohibits both pedestrians and vehicles from standing in or blocking

the middle of a roadway.  <u>Compare</u> N.M. Stat. Ann. §§ 66-7-339 and -340 (Michie 2004) (applying to pedestrians), <u>with</u> <u>id.</u> §§ 66-7-308, -349 to -352 (applying to vehicles).

On the other hand, the seizure of Defendant's person was not accomplished by means of a routine traffic stop, because Defendant fled from the street before he was actually seized.  Thus, while a traffic violation may form part of the totality of the circumstances, the Court's Fourth Amendment analysis is not limited by the procedural requirements of state or local law applicable to traffic citations.  <u>See</u> <u>Whren v. United States</u>, 517 U.S. 806, 814-16 (1996) (rejecting the notion that local police regulations are relevant to determining whether plainclothes officers in an unmarked police vehicle violated the Fourth Amendment when conducting a traffic stop).  Under federal law, "a police officer may effect an arrest if the officer 'has probable cause to believe that an individual has committed even a very minor criminal offense in his presence.'"  <u>Apodaca v. City of Albuquerque</u>, 443 F.3d 1286, 1289 n.2 (10th Cir. 2006) (quoting <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001)). Especially in light of the fact that the seizure of Defendant's person did not take the form of a routine traffic stop, the question whether the officers followed state procedural requirements in making the arrest is not relevant here.  <u>See</u> <u>id.</u>; <u>Whren</u>, 517 U.S. at 814-16.

Considered in isolation, Defendant's presence next to the white Caprice might be amenable to an innocent explanation.  Generally speaking, an individual's mere proximity to the scene of a traffic violation or other crime is not, in and of itself, a reasonable basis for suspecting that individual of being involved in the crime.  <u>See</u> <u>United States v. Vazquez-Pulido</u>, 155 F.3d 1213, 1216-17 (10th Cir. 1998).  But here the officers were not relying on

-19-

Defendant's mere proximity to the white Caprice, and the totality of the circumstances revealed more suspicious activity before they succeeded in seizing Defendant's person.

When the officers announced their presence and began walking toward the white Caprice, they observed that Defendant responded by turning and walking away from them at a fast pace while concealing his hands in his front waistband area.  Thus, as in Wardlow, 528 U.S. at 124, "it was not merely [Defendant's] presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police."

I recognize that there may be situations in which reasonable innocent persons might move away from police approaching a potential crime scene, as when bystanders move to the side of a road in order to make way for an oncoming police car with its emergency lights flashing, or when they do not immediately recognize that the persons approaching them are police officers.  But here, Defendant and the occupants of the white Caprice did not make way when the officers initially gestured for them to stop blocking the roadway, and the officers then observed that Defendant was concealing something in his hands in an evasive and threatening manner that is not consistent with an innocent retreat.  Defendant continued this evasive and threatening behavior as he was observed walking up to the Acura and placing a concealed object underneath it, all the while disobeying Officer McCormick's express and repeated commands to show his hands.

Like the "headlong flight" at issue in Wardlow, 528 U.S. at 124, Defendant's actions in concealing and attempting to hide the object that the officers later discovered to be a

-20-

loaded firearm are "consummate act[s] of evasion" that support the reasonableness of the officer's suspicions that criminal activity was afoot.  Considering these acts in light of the totality of the circumstances, I conclude that the officers had a particularized and objective basis for suspecting Defendant of criminal activity at the time he emerged from beside the Acura and raised his hands.

I next address whether the scope and duration of the investigative detention that followed was reasonable.  "[T]he use of firearms, handcuffs, and other forceful techniques" does not always fall within the limited scope of such an investigative detention based on reasonable suspicion.  United States v. Melendez-Garcia, 28 F.3d 1046,1052 (10th Cir. 1994); see generally Holt, 264 F.3d at 1220-26, 1228-30.  But an investigative detention based on reasonable suspicion does not necessarily preclude the use of such security measures when there are objective, reasonable concerns about officer safety.  See, e.g., Holt, 264 F.3d at 1223 (concluding that in light of an officer's "objective, reasonable basis to fear for his or her life every time a motorist is stopped," officers conducting routine traffic stops may order the driver and passengers to get out of the vehicle and to raise their hands during the stop); United States v. Perdue, 8 F.3d 1455,1463 (10th Cir. 1993) (concluding that it was not unreasonable under the circumstances for officers to execute an investigatory stop by drawing their weapons and ordering the defendant out of his car and onto the ground); Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030-31 (10th Cir. 1997) (concluding that it was not unreasonable under the circumstances for an officer to execute an

investigatory stop by grabbing a suspect by the arm and placing him face down on the pavement).

In this case, the totality of the circumstances known to the officers at the time of the seizure establish a reasonable, objective basis for concerns about officer safety that made it permissible for them to draw their weapons, order Defendant to show his hands and go to a prone position on the ground, and place him in handcuffs for a brief period while Officer McCormick went to look beneath the Acura for the purpose of finding what Defendant had placed there, and other officers secured the remaining suspects in the area.  An officer has an "objective, reasonable basis to fear for his or her life every time a motorist is stopped," Holt, 264 F.3d at 1223, and in this instance Officer McCormick was approaching the driveway and front yard area near the Acura under circumstances that raise similar concerns about officer safety.  While "the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a Terry stop[,]" Melendez-Garcia, 28 F.3d at 1053, in this case the officers' concerns about safety were justifiably heightened because Defendant's sudden and evasive movements created an element of surprise, there were a number of other potential suspects involved at the scene, and the seizure occurred in the darkness of the evening in a high-crime area, see Holt, 264 F.3d at 1223; Perdue, 8 F.3d at 1463; Gallegos, 114 F.3d at 1030-31.

Within the brief period during which an investigative detention was justified, the officers located the loaded firearm beneath the Acura and identified Defendant as a convicted felon.  They also identified the driver of the white Caprice, whom they recognized as a

suspect in prior narcotics trafficking investigations, and identified the driver of one of the other vehicles in the vicinity as a person with outstanding warrants who was in possession of a bag of marijuana.  None of this information dispelled their suspicion that criminal activity was afoot, and the officers did not exceed the permissible scope or duration of an investigative detention before gathering the information necessary to establish probable cause for a full custodial arrest.

Based on the additional facts gathered in rapid succession during this brief investigative detention, the officers' reasonable suspicion quickly ripened into probable cause supporting a full custodial arrest of Defendant and a search of his person incident to that arrest.  "An officer has probable cause to arrest if, under the totality of the circumstances, he 'learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001) (quoting Vazquez-Pulido, 155 F.3d at 1216).  And "officers may conduct a warrantless search of a person when it is incident to a lawful arrest of that person." United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998).

The probable-cause standard requires more than a mere suspicion, see id., but "'does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'"  United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams, 407 U.S. at 148-49).  Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had

probable cause to believe '*an* offense' had been committed." United States v. Edwards, 242 F.3d 928, 935 (10th Cir. 2001) (quoting United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)).  Here the officers need not rely solely on the initial traffic violation involving the white Caprice or Defendant's actions in evading Officer McCormick, because by the time they recovered the loaded firearm and identified Defendant, they also developed probable cause to believe that Defendant committed an offense by unlawfully possessing that firearm. And, as noted above, the officers had not yet exceeded the permissible scope or duration of their investigative detention before developing probable cause to arrest Defendant for the latter offense.

Invoking the principle that the Fourth Amendment protects both a residence and its curtilage, Defendant contends that something more than probable cause is required for a warrantless search and seizure in these circumstances.  In particular, Defendant contends that both he and the firearm were seized in proximity to the residence of his extended family member, Ms. Sharts, and that he has a reasonable expectation of privacy in the curtilage of this residence because he has visited there in the past and has an open invitation to continue doing so.

The Tenth Circuit recently addressed the boundaries of a residence's curtilage in United States v. Tolase-Cousins, 440 F.3d 1237, 1242-44 (10th Cir. 2006).  "'The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of  burglary as was afforded the house itself.'"  Id. at 1242 (quoting United States v. Dunn, 480 U.S. 294, 300 (1987)).  More recent precedents

recognize that "the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question will remain private.  The central component of this inquiry is whether the area harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of life.'" Id. (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)) (additional citation omitted).

In Dunn, 480 U.S. at 301, the Supreme Court articulated four factors to be used as analytical tools when they are relevant to determining "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. at 301.  These four factors are:  "(1) the proximity of the area to the house;  (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation." Tolase-Cousins, 440 F.3d at 1242.

In this case, proximity to the residence of Ms. Sharts is the only factor that might weigh in favor of a finding that the locations where Defendant and the loaded firearm were seized fell within the boundaries of that residence's curtilage.  As in Tolase-Cousins, 440 F.3d at 1242-44, all of the other relevant factors weigh against such a finding.

The area of the driveway and front yard where Defendant and the firearm were seized is not enclosed to any significant degree; on the contrary, these areas fall within the unobstructed path one would normally expect to follow in approaching the residence from the public street in front of it.  See id. at 1243.  Further, there is no indication that the area

in question was used for "intimate activities of the home," and it is not shielded from public view.  See id.  A residential driveway in this configuration bears no indication that parking is restricted to the homeowner, but instead appears to be open for visitors to park there as well.

Under these circumstances, the only reasonable conclusion is that Defendant was seized on a portion of the property "that was accessible to any and all persons wishing to enter upon it," and, therefore, does not fall within the definition of "curtilage" protected by the Fourth Amendment.  Id.  It follows that the officers could lawfully arrest Defendant in the front yard of the residence without a warrant so long as they had probable cause.

In developing probable cause, the officers could lawfully look for the loaded firearm around and beneath the Acura parked in the driveway beside the residence.  Even if one credits the evidence of Defendant's association with the nearby residence of Ms. Sharts, there is no credible evidence that Defendant lawfully owned or possessed the Acura at the time he was observed approaching that vehicle to hide the object he was carrying.  On the contrary, he was observed approaching the vehicle from the street in the same manner as any other member of the public.  Defendant has shown no reasonable expectation of privacy in these areas, and the Tenth Circuit has held that when a vehicle is publicly exposed in the manner described above, officers may bend down and look beneath the vehicle without triggering the requirements of the Fourth Amendment.  See United States v. Gonzalez-Acosta, 989 F.2d 384, 387-88 (10th Cir. 1993).

Finally, even if there were any illegality in the initial seizure of Defendant's person, that illegality did not taint the search and seizure of the loaded firearm, because the officers already observed Defendant placing an object in that location before he was seized within the meaning of the Fourth Amendment.  Thus, the officers' decision to look for the firearm beneath the Acura was based on information they independently obtained before the time that they actually succeeded in seizing Defendant's person.  It follows that the "fruit of the poisonous tree" doctrine does not apply to the loaded firearm, and the officers were free to use their observations regarding that firearm in developing probable cause to arrest Defendant, irrespective of whether he was previously seized for other reasons.

### B.   Selective Prosecution Claim

In his motion papers, Defendant also alludes to the possibility that the January 6, 2005, incident involved racial profiling or selective prosecution.  Claims of selective prosecution based on presumptively impermissible factors such as race or retaliation for the exercise of First Amendment rights generally do not implicate the Fourth Amendment but instead require some other constitutional basis, such as the Fourteenth Amendment's Equal Protection Clause.  See Whren, 517 U.S. at 813.

The essential elements of a selective prosecution claim under the Equal Protection Clause include both discriminatory effect and discriminatory intent.  See United States v. James, 257 F.3d 1173, 1178 (10th Cir. 2001); Poole v. County of Otero, 271 F.3d 955, 958 (10th Cir. 2001), abrogated in part on other grounds by Hartman v. Moore, 126 S. Ct. 1695, 1701 (2006).  To prove discriminatory effect, Defendant must make a credible showing that

a similarly-situated individual "could have been prosecuted for the offense for which the defendant was charged, but was not."  James, 257 F.3d at 1179; accord Poole, 271 F.3d at 958.  As to discriminatory intent, "'the defendant must prove that the government's selection of him for prosecution was invidious or in bad faith and was based on impermissible considerations such as'" the desire to prevent the exercise constitutional rights.  Poole, 271 F.3d at 958-59 (quoting United States v. Furman, 31 F.3d 1034, 1037 (10th Cir. 1994)).

        In this instance, Defendant's cursory allusions to racial profiling or selective prosecution do not provide the necessary factual basis or legal argument to show that the essential elements of a selective prosecution claim have been satisfied.  In particular, Defendant did not elicit any meaningful testimony concerning the number of African-American individuals the officers have detained and searched or the number of suspects of other races that the officer could have lawfully detained and searched but did not.  Thus, the Court concludes that Defendant is not entitled to suppression of the evidence in this case based on a selective prosecution claim.  See Poole, 271 F.3d at 959; James, 257 F.3d at 1181.

## III.   **CONCLUSION**

        For the foregoing reasons, the officers' search and seizure of Defendant's person and the loaded firearm found beneath the Acura on or about January 6, 2005, did not violate the Fourth Amendment, and there is no basis for excluding any of the evidence obtained during this incident.  Defendant also failed to satisfy the elements of a selective prosecution claim. Defendant's trial on the firearm charge stemming from the January 6, 2005, incident shall proceed as scheduled on July 24, 2006.

-28-

**IT IS, THEREFORE, ORDERED** that Defendant's first *Motion to Suppress Evidence* [Doc. 21] is **DENIED**.

**SO ORDERED** this 15th day of June, 2006, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge