# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

        Plaintiff,

    vs.                                         No. CR 05-1484 MCA

**JASON ALONZO CARRELL**,

        Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S SECOND MOTION TO SUPPRESS

**THIS MATTER** comes before the Court on Defendant Jason Alonzo Carrell's second *Motion to Suppress Evidence* [Doc. 38] filed on November 11, 2005.  Following several requests from the parties to extend the time for completion of briefing on pending motions [Doc. 12, 14, 16, 19, 26, 31, 34, 35, 36, 37, 41, 44, 46, 49, 50, 52, 55, 56, 57, 58, 59, 66], the Court held hearings on these motions in Albuquerque, New Mexico, on the following dates:  May 24, 2006; June 2, 2006; June 6, 2006; and June 9, 2006.  [Doc. 81, 85, 93, 95.]  Having considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearings, and being otherwise fully advised in the premises, the Court denies Defendant's second motion to suppress based upon the findings of fact and conclusions of law provided below.

Defendant is charged in a *Superseding Indictment* [Doc. 22] with one count of being a felon in possession of a firearm on or about January 6, 2005, and three other counts alleging various drug and firearms charges arising from an incident that occurred on or about July 13, 2005. Defendant has filed two motions to suppress evidence relating to the above charges. This *Memorandum Opinion and Order* addresses Plaintiff's second *Motion to Suppress Evidence*, which only pertains to the incident of July 13, 2005.

## I.    FINDINGS OF FACT

1.    Officers Tillman and Townsend of the Albuquerque Police Department (APD) were in uniform traveling in a marked APD vehicle on routine patrol on Central Avenue in the foothills region of Albuquerque, New Mexico, at approximately 11:15 p.m. on July 13, 2005, when the events described below occurred.

2.    Officer Tillman, a recent police academy graduate, was driving the APD vehicle, and Officer Townsend, serving as his field training officer, was seated in the front passenger seat.

3.    While driving westbound on Central Avenue, Officer Townsend saw a dark gray Chevrolet Monte Carlo with darkly tinted windows approach and go past the officers' vehicle traveling in the opposite direction with its bright lights on, in violation of a traffic code provision that prohibits the use of bright lights when approaching "an oncoming vehicle within 500 feet." N.M. Stat. Ann. § 66-8-831 (Michie 2004).

4.    Officer Tillman made a U-turn and followed the Monte Carlo for the purpose of making a traffic stop based on this observed traffic violation.

-2-

5.      The officers caught up with the Monte Carlo, and while following with their APD vehicle's headlights directed toward the rear of the Monte Carlo, Officer Townsend observed the Monte Carlo weave from side to side within its lane.

6.      Officer Townsend also was unsure of whether the driver (later identified as Defendant) was wearing the shoulder harness of his seat belt as he drove down Central Avenue, but the officer's concerns about the seat belt are irrelevant because they did not form the basis for the traffic stop and do not undermine the officer's credibility.

7.      After observing the bright-lights violation and following the Monte Carlo for a short period, Officer Tillman engaged the emergency lights on the APD vehicle, and also may have briefly engaged the siren in order to get the driver's attention; Defendant responded by making a right turn from Central Avenue onto Western Skies Road and parking the Monte Carlo beside a "7-11" store located on the southwestern corner of that intersection.

8.      Officer Tillman parked the APD vehicle behind the Monte Carlo and called in to the APD dispatcher to request checks on the Monte Carlo's license plate.

9.      After calling the APD dispatcher, Officers Tillman and Townsend both exited their APD vehicle and approached the Monte Carlo on foot, with Officer Tillman on the driver side and Officer Townsend on the passenger side.

10.     Between the time that the officers began following the Monte Carlo in their marked APD vehicle and the time that they approached the Monte Carlo on foot after Defendant stopped the Monte Carlo on Western Skies Road, there was ample opportunity

for Defendant to notice that he was being followed by police, put on his seat belt, and hide contraband, money, or weapons on his person and in his vehicle.

11.     While standing outside and slightly behind the driver's side door of the Monte Carlo, Officer Tillman requested and reviewed the driver's license and other documents provided by Defendant in response to the traffic stop; meanwhile, Officer Townsend attempted to observe Defendant's actions through the passenger side window of that vehicle, using his flashlight to see through a portion of the dark tint on the window.

12.     The photographs and other evidence concerning the dark tint on the Monte Carlo's windows that Defendant's investigator presented at the suppression hearing do not undermine Officer Townsend's credibility as to what he saw during the traffic stop because the lighting conditions are different; and, in any event, Officer Townsend was justified in opening the passenger-side door of the Monte Carlo to get a better view of the vehicle's interior regardless of whether he could see through the dark tint on the vehicle's windows.

13.     Observing through the passenger-side window with his flashlight (and later through the open passenger door), Officer Townsend saw that Defendant appeared to be slumping in his seat and concealing his right hand in his pants.

14.     Officer Townsend ruled out the possibility that Defendant was reaching for his driver's license or other documents associated with a normal traffic stop because it appeared that Officer Tillman was already reviewing that documentation as he stood outside and slightly behind the driver's side door of the Monte Carlo.

15.     Concerned that Defendant might be concealing contraband or preparing to draw a weapon from his pants, Officer Townsend opened the passenger side door of the Monte Carlo, drew his own firearm to the low-ready position, and saw that Defendant's right hand was not in his pants pocket but inside the pants themselves;  the officer also observed that Defendant's hand reached deeper inside his pants such that his right arm was extended into his pants beyond his wrist.

16.     This observation heightened Officer Townsend's suspicions about Defendant's reasons for placing his hand in his pants because in his experience as a police officer, he did not see drivers keep items legitimately needed for a traffic stop (such as a driver's license) deep inside their pants instead of in a pants pocket.

17.     Officer Townsend then ordered Defendant to remove his hand from his pants.

18.     Defendant turned his attention to Officer Townsend with a look of surprise but did not respond immediately to Officer Townsend's command; Officer Townsend then proceeded to repeat his commands for Defendant to remove his hand from his pants.

19.     Defendant did not begin to take his hand out of his pants until the officer repeated his commands several times, and when he finally did remove his hand from his pants, he only took it out about six inches.

20.     Officer Townsend then ordered Defendant to place his hands on the vehicle's steering wheel; Defendant did not comply with this command and, instead, placed his right hand back in his pants again.

-5-

21.     This action by Defendant heightened Officer Townsend's concerns that Defendant was going for a weapon, and so Officer Townsend again ordered Defendant to remove his hand from his pants and place his hands on the vehicle's steering wheel.

22.     Defendant eventually complied with this command and placed his hands on the steering wheel of the Monte Carlo; at that time Officer Townsend observed that Defendant was not holding anything in his hands.

23.     Next, the officers ordered Defendant to get out of the Monte Carlo, and Defendant eventually complied by stepping out of the driver's side door next to Officer Tillman.

24.     When Defendant stepped out of the Monte Carlo and stood immediately adjacent to the driver's side door, Officer Tillman instructed him to turn around and place his hands behind his back.

25.     Defendant turned around slowly but, instead of placing his hands behind his back, he immediately ran away from the officers down Western Skies Road.

26.     The officers pursued Defendant on foot in full view of a number of bystanders.

27.     During this pursuit, Officer Tillman initially caught up with Defendant and grabbed him by the shirt about five to ten yards from the front of the Monte Carlo.

28.     Defendant managed to slip out of his shirt very quickly and continue running on Western Skies Road.

29.     Next, Officer Townsend succeeded in grabbing Defendant from behind as he ran away, and there was a struggle between the two men.

30.     Officer Townsend gave Defendant several loud commands to stop resisting and stop fighting; Defendant did not comply with these commands.

31.     Defendant broke free from Officer Townsend, with Defendant striking the officer in the torso and shin in the process, and then another struggle ensued between Defendant and Officer Tillman as Defendant continued moving forward down the street.

32.     The officers repeated their commands for Defendant to stop resisting them, but he disregarded their commands and continued his concerted and violent struggle to break free from Officer Tillman.

33.     From the beginning of the traffic stop until this point in the struggle, Officer Townsend observed that Defendant did not appear to be injured or disabled in any way.

34.     While Defendant continued fighting and moving forward to break free from Officer Tillman, Officer Townsend struck Defendant's right thigh once with his collapsible baton; this was the first time Officer Townsend used his baton to strike an individual during his career as an APD officer, and the officer limited his use of the baton to one strike.

35.     The single strike with Officer Townsend's baton caused Defendant to collapse to the ground, but Defendant immediately raised himself from the ground again and continued fighting to break free from Officer Tillman.

36.     Officer Townsend then applied pepper spray to Defendant's face, and after the pepper spray took effect, the combined efforts of both officers succeeded in stopping Defendant and bringing him to the ground so that he could be handcuffed and taken into custody.

-7-

37.    At the end of the struggle, Officer Townsend was able to get to his radio and briefly request backup; immediately after getting Defendant in handcuffs the officers also summoned an ambulance and Fire Department vehicle to the scene to provide medical attention.

38.    Apart from the potential injuries inflicted by the single strike with the baton or the pepper spray, the officers at the scene were unaware of any pre-existing injuries or medical conditions that Defendant may have had at this point.

39.    Officers Gutierrez and Garcia pulled up to the scene to provide back up as Officers Townsend and Tillman had just finished handcuffing Defendant; after that, a team of paramedics, a Fire Department vehicle, and other police officers also arrived at the scene in quick succession.

40.    Defendant received prompt medical attention from the paramedics at the scene while the officers attended to other matters.

41.    Assisted by other officers, Officer Townsend retraced the path of his foot pursuit and found two bundles of what appeared to be cocaine lying within the path that Defendant had taken when fleeing from the spot where the Monte Carlo was parked.

42.    The officers found one bundle a short distance from where Defendant took his shirt off to escape from the grasp of Officer Tillman.

43.    The officers found the second bundle in close proximity to the location where Defendant was finally apprehended and handcuffed.

44.    Based on Officer Townsend's training and experience, which included several years of work on a narcotics squad, the packaging and quantities of both bundles were consistent with trafficking cocaine and not consistent with drugs kept for personal use.

45.    While other officers were attending to the drug evidence found in the street, Officer Gutierrez proceeded to interview a married couple that had observed portions of the struggle between Defendant and the officers; these individuals corroborated the officers' account of what happened.

46.    During his subsequent testimony at the suppression hearing, one of the individuals interviewed by Officer Gutierrez again corroborated Officer Townsend's account of what happened and noted that some other bystanders who witnessed portions of the incident had approached the officers yelling in a loud and aggressive manner during the officers' struggle with Defendant, which presented a further threat to the officers' safety during that period.

47.    Officer Gutierrez testified that she was unable to interview all of the bystanders who may have witnessed the incident because many of them dispersed when additional police officers (including herself) arrived at the scene.

48.    Officer Gutierrez could not devote her full attention to interviewing bystanders for the rest of the night, because she also was needed for other tasks, including the search of the Monte Carlo.

49.     While tasked with searching the passenger side of the Monte Carlo from front to back, Officer Gutierrez was unable to unlock the door to the glove box with the keys that were found in the vehicle at the scene of the traffic stop.

50.     Officer Gutierrez did not immediately request assistance from other officers as to what to do about the locked glove box at the scene, but she later informed other officers that the glove box was locked and that she had been unable to open and search it at the scene of the traffic stop.

51.     After working on the inventory search at the scene of the traffic stop, the officers arranged for the Monte Carlo to be towed to a more secure location in accordance with APD's policy on that subject, and the towing paperwork was delivered to Mr. Miller, an employee of APD's towing contractor.

52.     The task of loading the Monte Carlo onto the tow truck and towing it away from the scene was delayed until after midnight because Mr. Miller first had to wait for the police and other emergency vehicles to clear the scene, and then the Monte Carlo's engine would not start because its battery had lost power during the time the vehicle was left with its bright headlights on.

53.     Within one to two hours after midnight, Mr. Miller succeeded in towing the Monte Carlo to the contractor's tow yard a few blocks away near the intersection of Central Avenue and Juan Tabo.

54.     The tow yard where the Monte Carlo was stored in the pre-dawn hours of July 14, 2005, was lighted, fenced with razor wire, under twenty-four hour surveillance, and

protected by a guard dog; thus, neither the public nor the APD officers could safely access the interior of the tow yard without being escorted by a member of the towing contractor's staff.

56.     The tow truck driver, Mr. Miller, testified that it is customary under these circumstances for his company to hold a towed vehicle overnight and for the driver or owner of the vehicle to wait until the following morning to come to the tow yard and retrieve the vehicle.

56.     A check of the Monte Carlo's registration, which Officer Tillman had earlier requested, revealed that an individual named Rebecca Beal or Rebecca Beal-Crawford was the registered owner of that vehicle.

57.     At the suppression hearing on May 24, 2006, Ms. Beal-Crawford testified that she was out of state during the period encompassing July 13 and 14, 2005, and that she had removed all her belongings from the Monte Carlo and left the vehicle with Defendant for his use during this period, with the expectation that he would later purchase it from her; consequently, the registered owner of the Monte Carlo was not available and made no attempt to retrieve it during the period when the vehicle was in the custody of APD or its towing contractor on the evening of July 13-14, 2005.

58.     Defendant also was unavailable to retrieve the Monte Carlo during this period because he remained in police custody for purposes of receiving medical attention and being booked into jail; there is no evidence that he or anyone on his behalf attempted to retrieve the Monte Carlo from the tow yard during the night of July 13-14, 2005.

59.     While Mr. Miller was working on towing the Monte Carlo to the tow yard, Officers Gutierrez and Garcia accompanied Defendant and the ambulance team to Kaseman Hospital, where Defendant received additional medical attention before being booked into jail.

60.     While Defendant was lying down in the hospital, Officer Gutierrez removed his shoes, which had not been searched up to that point because of the intervening need to get him to the hospital and allow him to be examined by medical personnel.

61.     Officer Gutierrez's search revealed that Defendant was keeping a vehicle key, as well as a small amount of a substance that appeared to be marijuana, in his shoes.

62.     Around the time that Defendant was taken to the hospital and Officer Gutierrez searched his shoes, Detective Burge became involved in the investigation because that night she was working on serving Defendant with a recently issued arrest warrant for the firearm charge stemming from the earlier incident on January 6, 2005.

63.     Detective Burge became aware that Defendant had been taken into custody on the night of July 13-14, 2005, when she and other officers involved in attempting to serve the arrest warrant for the previous incident heard his name while monitoring APD radio communications concerning the arrangements for transporting Defendant to and from the hospital.

64.     Upon learning that Defendant had been taken into custody that night, Detective Burge contacted Officer Townsend, who in turn communicated with Officer Gutierrez, to relay the information about the arrest warrant for the previous incident on January 6, 2005.

65.     Officers Townsend and Gutierrez in turn relayed to Detective Burge the information concerning the July 13, 2005, incident, including the fact that the Monte Carlo's glove box was locked and had not been searched yet, as well as the fact that a vehicle key and a bag of marijuana had been found as a result of the search of Defendant's shoes at the hospital.

66.     After this information was relayed among the officers, Detective Burge arranged to meet Officer Gutierrez at the hospital.

67.     While Officer Gutierrez remained at the hospital with Defendant and the Monte Carlo remained in the tow yard during the pre-dawn hours of July 14 2005, Detective Burge came to the hospital and retrieved the key that Officer Gutierrez recovered from Defendant's shoe.

68.     Detective Burge then decided to take the vehicle key found in Defendant's shoe to the tow yard and see whether it would unlock the Monte Carlo's glove box.

69.     Mr. Miller, the tow truck driver who had transported the Monte Carlo, was then summoned back to the tow yard to let Detective Burge gain access to the Monte Carlo so she could try opening the glove box with the key found in Defendant's shoe.

70.     Mr. Miller met Detective Burge at the tow yard between 2:30 a.m. and 3:00 a.m. on July 14, 2005, and while Mr. Miller observed, Detective Burge was able to open the Monte Carlo's glove box with the key found in Defendant's shoe.

71.     Inside the glove box, Detective Burge and Mr. Miller observed in plain view a handgun and a magazine, which Detective Burge subsequently seized, photographed, and

-13-

identified as the Glock 40 caliber, model 22 handgun and ammunition that Defendant is charged with unlawfully possessing in Count 2 of the *Superseding Indictment*.

72.     I find Detective Burge's and Mr. Miller's testimony regarding the discovery of the handgun and magazine in the glove box to be credible.

73.     The officer's initial traffic stop of the Monte Carlo was supported by a reasonable suspicion that Defendant was engaged in a traffic violation by approaching oncoming traffic with his bright lights on.

74.     Defendant's non-compliance with Officer Townsend's initial commands--and particularly Defendant's concealment of his right hand in his pants behind the darkly tinted windows of the Monte Carlo--gave rise to objectively reasonable concerns about officer safety and a reasonable suspicion that more serious criminal activity was afoot, which justified the additional security measures employed by the officers in directing Defendant to exit from the Monte Carlo and show his hands.

75.     These officer safety concerns and reasonable suspicions were further heightened when, without revealing what he had been reaching for in his pants, Defendant fled from the officers on foot and disobeyed their commands to stop, leaving two bundles of cocaine in his path.

76.     The officers did not exceed the permissible scope of an investigative detention when they pursued and made physical contact with Defendant, and the force they used during their initial foot pursuit was not so unreasonable or excessive as to taint any evidence subsequently obtained as a result of that foot pursuit.

77.     When Defendant responded to the officers' initial contacts during the foot pursuit by resisting and striking them, the officers' reasonable suspicions ripened into probable cause to believe he had committed the offense of battery upon a peace officer, in violation of N.M. Stat. Ann. § 30-22-24 (Michie 2004), and resisting, evading, or obstructing an officer, in violation of N.M. Stat. Ann. § 30-22-1 (Michie 2004).

78.     Having probable cause to believe Defendant had committed these offenses in a public street, the officers were then justified in conducting a full custodial arrest.

79.     When responding to Defendant's resistance during the foot pursuit, the officers did not use unreasonable or excessive force.

80.     The officers ceased the use of their forceful techniques when Defendant went to the ground and stopped resisting, and the officers promptly summoned an ambulance and Fire Department personnel to the scene to attend to any injuries Defendant sustained during his effort to resist arrest.

81.     The discovery of the bundles of crack cocaine in the path of their foot pursuit gave the officers additional probable cause to justify Defendant's continued detention and, in any event, there was already a valid federal warrant for Defendant's arrest that was within the collective knowledge of the APD officers, including Detective Burge.

82.     Under the totality of the circumstances, including the location of the bundles of crack cocaine and the evidence of Defendant's concealment and flight, the officers developed probable cause to remove and search Defendant's shoes for additional contraband; these items would have been inevitably discovered during the search that is routinely

performed upon booking arrestees into jail, and any delay in searching Defendant's shoes incident to his arrest was occasioned by the intervening need to provide him with prompt medical attention.

83.     Combined with the totality of the circumstances recited above, the discovery of the key and the marijuana when removing Defendant's shoes gave the officers probable cause to search the Monte Carlo's locked glove box for additional contraband or weapons.

84.     The registered owner of the Monte Carlo testified that she was out of town during the period in question and had given Defendant permission to use that vehicle during her absence; this testimony shows that Defendant had a reasonable expectation of privacy in the Monte Carlo at the time the officers initiated the traffic stop.

85.     But Defendant abandoned his privacy interest in the vehicle and its contents when he fled the scene of the traffic stop on foot, leaving the vehicle unlocked and unattended; therefore, Defendant lacks standing to challenge the search of the Monte Carlo and its glove compartment that occurred after he fled.

86.     Defendant also has not shown that he has any reasonable expectation of privacy in the areas of the street, curb, or sidewalk in the path of the officers' foot pursuit where the bundles of crack cocaine and shirt were found; like the Monte Carlo, Defendant abandoned whatever privacy interest he had in the other items found in the street after his flight.

87.     The officers did not forcibly remove the bundles of crack cocaine from Defendant during their traffic stop or foot pursuit, and thus the officers' discovery of these bundles is untainted by any potential illegality in the officer's use of force.

## II.     LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.     Fourth Amendment Claims

On Fourth Amendment grounds, Defendant moves to suppress all of the evidence obtained by police as a result of the July 13, 2005, incident resulting in his arrest, the search of his shoes, and the search of the Monte Carlo's glove box.  Defendant's motion requires the Court to determine (1) whether the initial traffic stop was supported by a reasonable suspicion that Defendant committed a traffic violation, (2) whether the officers acted within the permissible scope of an investigative detention by ordering Defendant to show his hands and exit the vehicle, and by pursuing and using force to subdue Defendant when he fled, (3) whether the officers developed probable cause to arrest Defendant after he resisted and struck back at them during their initial attempts to stop him from fleeing, (4) whether the officers used unreasonable or excessive force in responding to Defendant's resistance by, among other things, striking his leg with a baton and spraying his face with pepper spray in order to effect the arrest, (5) whether the officers were justified in removing and searching Defendant's shoes for additional contraband after locating the bundles of cocaine in the path of their foot pursuit, and (6) whether the officers had probable cause to search the Monte Carlo's glove box for weapons or contraband.

For the following reasons, I answer all of these questions in the affirmative and also determine that Defendant lacked a reasonable expectation of privacy in the Monte Carlo or its glove box at the time of Detective Burge's search.  Accordingly, I conclude that the evidence in question is untainted by any Fourth Amendment violation.

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness." United States v. Chadwick, 433 U.S. 1, 12 (1977), overruled in part on other grounds, California v. Acevedo, 500 U.S. 565 (1991).  In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.  Whren v. United States, 517 U.S. 806, 809-10 (1996).  Thus, Defendant was initially seized within the meaning of the Fourth Amendment when he stopped the Monte Carlo in response to the APD vehicle's flashing emergency lights and siren.  See id.

The seizure of Defendant's person is "reasonable" under the Fourth Amendment "'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).  The subjective motivations of the officer performing the stop are not relevant to determining whether that officer's

suspicions are "reasonable" under the Fourth Amendment.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001).  "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'"  See Brigham City v. Stuart, 126 S. Ct. 1943, 1948 (2006) (quoting Scott v. United States, 436 U.S. 128, 138 (1978) (emphasis added)).

Thus, it does not matter whether the officers subjectively thought they were stopping Defendant for a seatbelt violation, approaching oncoming traffic with his bright lights on, or some other traffic violation.  What matters is that Officer Townsend credibly testified that he observed Defendant driving toward oncoming traffic with his bright lights on.  This observation provided the officers with reasonable suspicion or probable cause to stop Defendant for a violation of N.M. Stat. Ann. § 66-3-831.

In this regard, I find that any differences in the officer's testimony as to when, whether, or to what extent he could see through the Monte Carlo's darkly tinted windows do not undermine his credibility as to the bright-lights violation, because differences in location and lighting conditions at night provide a logical explanation for the officer's varying perceptions of the Monte Carlo's windows during the course of the vehicular pursuit and traffic stop.  Based on the bright-lights violation alone, the traffic stop of the Monte Carlo driven by Defendant was justified at its inception.  See Callarman, 273 F.3d at 1283.

Before issuing a traffic citation, the Fourth Amendment permits a police officer who has made a lawful traffic stop to request a driver's license and vehicle registration from the vehicle's occupants, see United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998),

-19-

ask about their travel plans and ownership of the vehicle, see United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989), and respond to objectively reasonable concerns about the officer's safety, see United States v. Holt, 264 F.3d 1215, 1220-26, 1228-30 (10th Cir. 2001) (en banc).  In this case, however, the officers were unable to complete the license and registration check or issue a traffic citation because of their need to respond to objectively reasonable concerns about their safety, which arose when Officer Townsend's view was obscured by the Monte Carlo's darkly tinted windows and when Defendant initially refused to take his right hand out of his pants while he remained seated in the Monte Carlo.

In the interest of officer safety during a routine traffic stop, "an officer may order the driver and passengers out of the vehicle; order the passengers to remain in the vehicle;  open the door of a vehicle with darkly tinted windows to check for weapons;  order the occupants to raise their hands during the stop; and use a flashlight to check the dark interior of a car." Id. at 1223 (citations omitted).  Thus, even before observing Defendant place his hand in his pants, the officers in this case were justified in opening the door of the Monte Carlo, using a flashlight to gain a better view of the vehicle's interior, and ordering Defendant to exit the vehicle.  The fact that the officers' view into the Monte Carlo's passenger compartment was partially obscured by the vehicle's darkly tinted windows only heightens the officer-safety concerns which justify such measures.  See id. (citing United States v. Stanfield, 109 F.3d 976, 981-82 (4th Cir. 1997)).

Officer Townsend's decision to draw his weapon or make an additional show of force may require further justification in this context because "the use of firearms, handcuffs, and

other forceful techniques" does not always fall within the limited scope of an investigative detention such as a traffic stop.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994); see generally Holt, 264 F.3d at 1220-26, 1228-30.  But the evidence of record in this case provides ample justification for the use of such additional security measures for a brief period while the officers determined what Defendant might be concealing on his person or elsewhere in the interior of the Monte Carlo.  An officer has an "objective, reasonable basis to fear for his or her life every time a motorist is stopped," Holt, 264 F.3d at 1223, and in this instance the officer's concerns about safety were justifiably heightened because of Defendant's efforts to conceal his right hand in his pants and his noncompliance with the initial command to show his hands.  Under these circumstances, the Fourth Amendment does not preclude the use of the security measures at issue here based on objective, reasonable concerns about officer safety.  See id.; United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993) (concluding that it was not unreasonable under the circumstances for officers to execute an investigatory stop by drawing their weapons and ordering the defendant out of his car and onto the ground); Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030-31 (10th Cir. 1997) (concluding that it was not unreasonable under the circumstances for an officer to execute an investigatory stop by grabbing a suspect by the arm and placing him face down on the pavement).

While the officers attempted to accomplish the permissible goals of a traffic stop, Defendant again thwarted their efforts by fleeing the scene on foot.  Like the "headlong flight" at issue in Illinois v. Wardlow, 528 U.S. 119, 124 (2000), Defendant's actions in

concealing his right hand in his pants and then running away from the officers are "consummate act[s] of evasion" which support the reasonableness of the officer's suspicions that further criminal activity, above and beyond a normal traffic violation, was afoot. Considering these acts in light of the totality of the circumstances, I conclude that the officers had a particularized and objective basis for pursuing and detaining Defendant for further questioning at that time.  And, in any event, Defendant was no longer "seized" within the meaning of the Fourth Amendment when he escaped the scene of the traffic stop by fleeing on foot.  See California v. Hodari D., 499 U.S. 621, 625-27 (1991).

The next question is whether, in the course of their foot pursuit, the officers again seized Defendant through the application of physical force and simultaneously developed probable cause to effect a full, custodial arrest.  "To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a continuing arrest during the period of fugitivity."  Id. at 625.  Thus, to the extent the bundles of cocaine fell from Defendant's person onto the street after he broke away from the officers' grasp, "it would hardly be realistic to say that that disclosure had been made during the course of an arrest."  Id.

But I find it unnecessary to determine the exact moments at which the bundles of cocaine fell to the street in relation to the officers' physical contacts with Defendant during their foot pursuit, because even if Defendant was "seized" for purposes of the Fourth Amendment at those moments, the officers had probable cause to justify a full custodial arrest and a search of Defendant's person incident to that arrest.  Under federal law, "a police

officer may effect an arrest if the officer 'has probable cause to believe that an individual has committed even a very minor criminal offense in his presence.'"  Apodaca v. City of Albuquerque, 443 F.3d 1286, 1289 n.2 (10th Cir. 2006) (quoting Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)).  And "officers may conduct a warrantless search of a person when it is incident to a lawful arrest of that person." United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998).

Here the officers were no longer dealing with a mere traffic violation, for Defendant's acts of resisting and striking at the officers in response to their initial contacts with him during the foot pursuit gave the officers probable cause to believe that Defendant committed the more serious crimes of battery upon a peace officer, see N.M. Stat. Ann. § 30-22-24 (Michie 2004), and resisting, evading, or obstructing an officer, see N.M. Stat. Ann. § 30-22-1 (Michie 2004).  While it is true that Defendant might raise a claim of self-defense to such charges, see State v. Hill, 2001-NMCA-094, ¶ 8, 131 N.M. 195, 34 P.3d 139, the probable-cause inquiry "'does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'"  United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams v. Williams, 407 U.S. 143, 148-49 (1972)).  Thus, for purposes of the probable-cause inquiry, the totality of the circumstances supports a finding that Defendant's conduct posed a threat to the officer's safety and a meaningful challenge to their authority, which could support an arrest on the above charges. See State v. Padilla, 1997-NMSC-022, ¶ 7, 123 N.M. 216, 937 P.2d 492.

Defendant contends that even if the officers had probable cause to arrest him at that point, they nevertheless violated the Fourth Amendment by using unreasonable or excessive force to effect the arrest, and that this violation tainted the evidence the officers subsequently obtained.  Unlike the substantive offenses which inform the probable-cause inquiry at this point, the standard for determining whether the officers' use of force was unreasonable or excessive is defined by the interpretation of the Fourth Amendment provided by the Supreme Court and the Tenth Circuit, rather than the requirements of state or local law.  See generally Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001); Romero v. Bd. of County Comm'rs., 60 F.3d 702, 705 (10th Cir. 1995); Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995), abrogated on other grounds by Saucier v. Katz, 533 U.S. 194 (2001).  In particular, Defendant's excessive-force claim must be analyzed under the Fourth Amendment standard of "objective reasonableness" as articulated by the Supreme Court in Graham v. Connor, 490 U.S. 386 (1989).

Although Defendant makes much of the fact that he sustained injuries in previous shooting incidents which may affect his ability to hear out of his left ear, the subjective intentions or state of mind of the Defendant are not relevant to determining whether the officers used excessive force in this context, because the objective reasonableness of the officers' actions is not determined on the basis of the way the scene appeared to Defendant or what he was actually thinking at the time.  See United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).  Rather, "the reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may

-24-

be 'forced to make split-second judgments' under stressful and dangerous conditions." Medina, 252 F.3d at 1131 (quoting Graham, 490 U.S. at 396-97).  This assessment must be "based upon the information the officers had when the conduct occurred," Saucier, 533 U.S. at 207, and is not to be judged "with the 20/20 vision of hindsight," Graham, 490 U.S. at 396; see Kopf v. Skyrm, 993 F.2d 374, 379 (4th Cir. 1993) (concluding that so long as "probable cause is present, the actual guilt or innocence of the arrestee is irrelevant to the amount of force that may be used").

Defendant also refers to APD's standard operating procedures in questioning the officers' account of the search and seizure at issue here.  The objective reasonableness of the officers' conduct in performing the initial traffic stop and seizing Defendant's person is not measured by such standard operating procedures or procedural requirements of state or local law.  The fact that an officer did not comply with his or her employer's standard operating procedures, or did not use a less intrusive alternative means of detaining a suspect, does not necessarily mean that the officer's conduct was "unreasonable" under the Fourth Amendment.  See Whren, 517 U.S. at 814-16; Medina, 252 F.3d at 1133; Romero, 60 F.3d at 705; Wilson, 52 F.3d at 1554.  Accordingly, Defendant's reference to standard operating procedures does not supplant the test of objective reasonableness that has been defined by the Supreme Court and the Tenth Circuit.

Under this test, the factors which are relevant to the reasonableness of the force used to effect an arrest "include the crime's severity, the potential threat posed by the suspect to the officer and others' safety, and the suspect's attempts to resist or evade arrest."  Saucier,

533 U.S. at 207.  The Fourth Amendment permits officers to use some degree of physical coercion or threat thereof to effectuate an arrest.  See id. at 208; Graham, 490 U.S. at 396. And, as noted above, it is not necessarily unreasonable for officers to make a limited show of force, which may involve some degree of physical contact with a suspect, in the process of an investigative detention based on reasonable suspicion when, as here, objectively reasonable concerns about officer safety are present.  See Holt, 264 F.3d at 1223; Perdue, 8 F.3d at 1463; Gallegos, 114 F.3d at 1030-31.

In this case, these factors weigh in favor of a finding that the officers' use of force was not unreasonable.  As in Gallegos, 114 F.3d at 1030-31, the initial pursuit and physical contact with Defendant fell within the permissible scope of an investigative detention.  And when Defendant responded to these initial contacts by physically resisting and striking at the officers, there was a corresponding increase in the severity of the crime and the level of threat posed to the officer and others' safety.  Under the totality of the circumstances, the officers did not use excessive force in striking Defendant's leg with a baton and spraying his face with pepper spray while he was physically resisting arrest in a strenuous and violent manner.  In this regard, it is important to note that the officers' use of such tactics ceased once Defendant went to the ground and he was restrained in handcuffs, and at that time the officers did not know of Defendant's medical history relating to the earlier shooting incidents that Defendant mentioned in his subsequent testimony at the suppression hearing.

After retracing the path of their foot pursuit and finding the bundles of crack cocaine, the officers developed probable cause to search Defendant's person and the Monte Carlo for

additional contraband or weapons.  Given the manner in which Defendant initially concealed his right hand in his pants, took off running when he exited the Monte Carlo, and dropped one or more bundles of cocaine during his flight, the officers had reason to believe that Defendant might have secreted additional contraband or a weapon elsewhere on his person.

And once he was placed under arrest, Defendant's privacy interest in the contents of his shoes was diminished to a significant degree.  At that point, he was subject to some forms of search incident to arrest aimed at preserving evidence that may be destroyed or lost if left in his possession.  See, e.g., Cupp v. Murphy, 412 U.S. 291, 296 (1973) (permitting very limited search necessary to preserve "highly evanescent evidence" found under a detainee's fingernails); United States v. Edwards, 415 U.S. 800, 803 (1974) (permitting a warrantless seizure of a detainee's clothing approximately ten hours after his arrest); Anchondo, 156 F.3d at 1045 ("[O]fficers may conduct a warrantless search of a person when it is incident to a lawful arrest of that person.").  In addition, Defendant was subject to routine searches for weapons and contraband that are conducted for the purpose of maintaining security in the facilities in which he was detained.  See Bell v. Wolfish, 441 U.S. 520, 557 (1979).

Although Defendant was taken to a hospital for medical treatment instead of being taken immediately to jail following his arrest, this fact does not diminish the officers' authority to conduct a search of his shoes at the hospital.  The officers acted reasonably in waiting for medical personnel to examine and treat Defendant for obvious injury or discomfort (such as that occasioned by the pepper spray) before completing the search of his person incident to his arrest.

-27-

Under the "fellow officer" rule, all of the officers involved in the investigation of Defendant's activities may pool their information, such that the probable-cause inquiry turns on their combined, collective knowledge. See United States v. Hensley, 469 U.S. 221, 231 (1985); United States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997); United States v. Morgan, 936 F.2d 1561, 1569 (10th Cir. 1991). Thus, it is immaterial that the officers who performed the subsequent search of Defendant's shoes and the Monte Carlo were not the same officers who made the arrest and found the bundles of crack cocaine.

Even if the officers were permitted to retrieve the vehicle key from Defendant's shoe, Defendant contends that the subsequent warrantless search of the Monte Carlo's glove box violated the Fourth Amendment. Before addressing this contention, however, I must first address the issue of Defendant's standing to challenge the search of the Monte Carlo and its glove box. While Defendant obviously has standing to challenge the seizure of his person at the scene of the traffic stop, see United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996), he has established no illegality with respect to his arrest on that date which would require suppression of evidence subsequently seized from the Monte Carlo as "fruit of the poisonous tree."

Lacking any other basis for challenging Detective Burge's search of the Monte Carlo's glove box, it is Defendant's burden to establish that he has an interest in the vehicle and its contents that is protected by the Fourth Amendment. See United States v. Arango, 912 F.2d 441, 444 (10th Cir. 1990); United States v. Rascon, 922 F.2d 584, 587 (10th Cir. 1990). The existence of a cognizable Fourth Amendment right to be free from unreasonable

searches and seizures of a motor vehicle depends on two factors:  whether the individual in question has exhibited a subjective expectation of privacy in the vehicle, and whether society recognizes that subjective expectation as reasonable.  See Rascon, 922 F.2d at 586. Although formal documentation (such as a certificate of title or registration form) is not necessarily required in order to establish proof of ownership or legitimate possession, mere possession or control of the vehicle alone is not sufficient to satisfy this test.  See United States v. Jefferson, 925 F.2d 1242, 1249-50 (10th Cir. 1991); Arango, 912 F.2d at 445.

At the suppression hearing, Defendant presented testimony from a witness who stated that she was the registered owner of the Monte Carlo and that she had given Defendant permission to use that vehicle while she was out of town during the period encompassing July 13-14, 2005.  This testimony is sufficient to establish that Defendant had a reasonable expectation of privacy in the Monte Carlo and its contents at the time the officers initiated the traffic stop and ordered him to step out of the vehicle.  See Jefferson, 925 F.2d at 1249-50; Arango, 912 F.2d at 445.

The question remains whether Defendant abandoned his privacy interest in the Monte Carlo and its contents when he fled from the scene of the traffic stop on foot, leaving the vehicle unlocked and unattended.  "The Fourth Amendment allows for warrantless search and seizure of abandoned property," so long as the abandonment is voluntary and does not result from illegal police conduct.  United States v. Flynn, 309 F.3d 736, 738 (10th Cir. 2002).  Under this test, Defendant cannot be deemed to have abandoned the Monte Carlo

merely because he opened the door and stepped out of the vehicle in response to the officer's commands; such actions were not voluntary.

On the other hand, the fact that Defendant subsequently fled from the scene of the traffic stop on foot strongly supports a finding that he abandoned his privacy interest in the Monte Carlo and its contents. Other courts have held that "a suspect who flees an unlocked vehicle parked on a public roadway thereby abandons his expectation of privacy" in the vehicle. United States v. Tate, 821 F.2d 1328, 1330 (8th Cir. 1987); accord United States v. Hurst, 228 F.3d 751, 758 n.3 (6th Cir. 2000); United States v. Barlow, 17 F.3d 85, 88-89 (5th Cir. 1994); United States v. Grecni, Nos. 90-3483 & 90-3571, 1991 WL 139703, at *3 (6th Cir. July 30, 1991) (unpublished disposition). For these reasons, I conclude that Defendant lacks standing to contest the search of the Monte Carlo and its glove compartment that occurred after he fled the scene of the traffic stop.

In the alternative, I also conclude that if Defendant continued to have a reasonable expectation of privacy in the Monte Carlo at that point, then the Government has met its burden of proving that the warrantless search of the vehicle's glove box was "reasonable" within the meaning of the Fourth Amendment. Defendant contends that the Government cannot meet this burden because there is some indication that Detective Burge and other officers thought they were performing an inventory search of the Monte Carlo, and because there may have been some deviation from the normal routine that APD officers follow in completing an inventory search.

An important premise behind Defendant's arguments relating to the "inventory search" exception to the Fourth Amendment's warrant requirement is the contention that the officers lacked probable cause to search the Monte Carlo and its glove box for evidence of crime, for the "inventory search" exception only comes into play when probable cause for the search is lacking. See Colorado v. Bertine, 479 U.S. 367, 371 (1987). When the officers have probable cause to search a vehicle, then there is no occasion to reach the "inventory search" exception because the search is instead justified under the "automobile exception" to the warrant requirement. See Chambers v. Maroney, 399 U.S. 42, 51-52 (1970). Thus, the Supreme Court repeatedly has held that it is error for lower courts to jump to the requirements of an inventory search or some other exception without first examining the underlying issue of whether the search of a vehicle was justified by probable cause alone. See Florida v. Meyers, 466 U.S. 380, 382 (1984); Michigan v. Thomas, 458 U.S. 259, 261 (1982) (per curiam); Texas v. White, 423 U.S. 67, 68 (1975) (per curiam);

On this point, the Tenth Circuit also has held that: "if the police, while making an arrest, find probable cause to search the arrested individual's automobile, such a search then 'proceeds on a theory wholly different from that justifying the search incident to an arrest'" or an inventory search. United States v. McKinnell, 888 F.2d 669, 673 (10th Cir. 1989) (quoting Chambers, 399 U.S. at 49). "Because it is probable cause, not the arrest, that is then the justification for the search of the automobile, the police may search the impounded automobile at a later time . . . in a protected and controlled environment." Id. In light of this

clear precedent, I decline Defendant's invitation to proceed to the analysis of the "inventory search" exception without first examining the underlying issue of probable cause.

The collective knowledge the officers gathered in the hours leading up to the search of the Monte Carlo's glove compartment included the following facts bearing on the probable-cause inquiry: (1) Officer Townsend's observation that Defendant had the opportunity to hide weapons or contraband in the Monte Carlo between the time that he noticed he was being followed by police and the time he pulled over the vehicle; (2) Officer Townsend's observation of Defendant's actions in concealing his right hand in his pants and failing to promptly comply with the officers' commands at the scene of the traffic stop; (3) Officer Townsend's observation of Defendant's flight from the Monte Carlo and his level of resistance in response to the officers' efforts to subdue him during the ensuing foot pursuit; (4) the discovery of two bundles arranged in a manner consistent with cocaine trafficking in the path of Officer Townsend's foot pursuit; (5) Officer Gutierrez's observation that the Monte Carlo's glove compartment was locked and that none of the keys found at the scene of the traffic stop would open it; (6) Officer Gutierrez's subsequent discovery of a vehicle key and a small bag of marijuana upon removing Defendant's shoes at the hospital; and (7) the outstanding federal arrest warrant relating to the previous incident of January 6, 2005, which involved a firearms charge. I conclude that this information, considered in its totality, gave the officers probable cause to open the glove box with the key found in Defendant's shoe in order to find out whether he had secreted additional evidence of a crime in that location.

Defendant rightly points out that there was some equivocation or ambiguity in the officers' testimony at the suppression hearing as to whether they subjectively thought they were carrying out the standard procedures for an inventory search and whether their subjective motives also included an interest in searching the Monte Carlo's glove compartment for further evidence of crime.  Thus, it might be argued that the search in question here was a pretextual inventory search, where the officers went through the motions of performing an inventory with an underlying motivation to look for further evidence of criminal activity.

Such equivocal, ambiguous, or pretextual motives do not violate the Fourth Amendment in this context, however, because the existence of probable cause to search the glove box is to be determined by an objective standard rather than the subjective intentions of the officer(s) performing or directing the search.  See Sullivan, 532 U.S. at 771-72; Whren, 517 U.S. at 812-13.  Thus, it does not matter whether one or more of the officers subjectively thought they were performing an inventory search or some other kind of search, so long as the factual information collectively available to the officers established probable cause to suspect that the Monte Carlo's glove box contained weapons or contraband while stored at the tow yard on the night of July 13-14, 2005.  Similarly, it does not matter whether one or more of the officers (or the prosecutors, for that matter) were young and inexperienced in the practice of inventory searches, because the application of the "automobile exception" depends on the objective reasonableness of the search under the Fourth Amendment, not on broader questions as to whether a government employee's job

performance was competent, diligent, or otherwise in accordance with professional standards imposed by state or local law.

Because the officers had probable cause to search the Monte Carlo's glove compartment for additional evidence of criminal activity, Detective Burge's search of that location falls under the "automobile exception" to the warrant requirement and is objectively reasonable under the Fourth Amendment.  It follows that there is no basis for suppressing the evidence found within the glove compartment under the exclusionary rule.

### B.   Selective Prosecution Claim

In his motion papers, Defendant also alludes to the possibility that the July 13, 2005, incident involved racial profiling or selective prosecution.  Claims of selective prosecution based on presumptively impermissible factors such as race or retaliation for the exercise of First Amendment rights generally do not implicate the Fourth Amendment but instead require some other constitutional basis, such as the Fourteenth Amendment's Equal Protection Clause.  See Whren, 517 U.S. at 813.

The essential elements of a selective prosecution claim under the Equal Protection Clause include both discriminatory effect and discriminatory intent.  See United States v. James, 257 F.3d 1173, 1178 (10th Cir. 2001); Poole v. County of Otero, 271 F.3d 955, 958 (10th Cir. 2001), abrogated in part on other grounds by Hartman v. Moore, 126 S. Ct. 1695, 1701 (2006).  To prove discriminatory effect, Defendant must make a credible showing that a similarly-situated individual "could have been prosecuted for the offense for which the defendant was charged, but was not."  James, 257 F.3d at 1179; accord Poole, 271 F.3d at

958.  As to discriminatory intent, "'the defendant must prove that the government's selection of him for prosecution was invidious or in bad faith and was based on impermissible considerations such as'" the desire to prevent the exercise constitutional rights.  Poole, 271 F.3d at 958-59 (quoting United States v. Furman, 31 F.3d 1034, 1037 (10th Cir. 1994)).

In this instance, Defendant's cursory allusions to racial profiling or selective prosecution do not provide the necessary factual basis or legal argument to show that the essential elements of a selective prosecution claim have been satisfied.  In particular, Defendant did not elicit any meaningful testimony concerning the number of African-American individuals the officers have detained and searched or the number of suspects of other races that the officer could have lawfully detained and searched but did not.  Thus, the Court concludes that Defendant is not entitled to suppression of the evidence in this case based on a selective prosecution claim.  See Poole, 271 F.3d at 959; James, 257 F.3d at 1181.

## III.   **CONCLUSION**

For the foregoing reasons, the searches and seizures performed by the officers on the night of July 13-14, 2005, did not violate the Fourth Amendment, and Defendant also failed to satisfy the elements of a selective prosecution claim.

**IT IS, THEREFORE, ORDERED** that Defendant's second *Motion to Suppress* [Doc. 38] is **DENIED**.

**SO ORDERED** this 30th day of June, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge